IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGINIA HAWTHORNE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2350 |
| | § | |
| KS MANAGEMENT SERVICES, LLC | § | |
| d/b/a KELSEY-SEYBOLD CLINIC, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM AND ORDER

Pending is Defendant KS Management Services, LLC's Motion for Summary Judgment (Document No. 19). After carefully considering the motion, response, reply, and applicable law, the Court concludes as follows.

I. Background

Plaintiff Virginia Hawthorne worked as an executive assistant for Defendant KS Management Services, LLC d/b/a Kelsey-Seybold Clinic from late 2011 until her termination in July 2015.[1] Defendant provides medical care and administrative and management services in the medical field, and has over 3,000 employees.[2]

---

[1] Document No. 19, ex. A ¶ 9 (Decl. of Lakeisha Backus, a Manager and Human Resources Business Partner for Defendant) (stating Plaintiff was hired on November 26, 2011); Document No. 28, ex. A ¶ 2 (Pl.'s Decl.) (stating Plaintiff began working for Defendant in September 2011).

[2] Document No. 19, ex. A ¶¶ 3-4.

Plaintiff's role as an executive assistant was to provide clerical and administrative support to one or more vice presidents or medical directors in Defendant's Medicare Advantage department.[3] Plaintiff's annual performance reviews consistently rated her between "Exceeds expectations" and "Outstanding," and Defendant stipulates that Plaintiff was not discharged for performance reasons.[4] Plaintiff has a herniated disc in her cervical spine and during her employment would see her neurologist, Dr. G. Martin Rossi, on a quarterly basis.[5] Plaintiff's job description stated that its physical demands included lifting up to 25 pounds and carrying up to 10 pounds.[6]

Plaintiff began assisting Gwendolyn Dalcour, Defendant's Director of Claims, in March 2015.[7] The next month, Dalcour assigned Plaintiff the new task of picking up mail from three post office boxes.[8] Plaintiff first picked up the mail, which weighed more than 20 pounds, in mid-April and promptly began to experience

---

[3] Id., ex. A ¶ 9.

[4] Document No. 19 at 21; Document No. 28, ex. A-3 (performance reviews).

[5] Document No. 28, ex. A ¶ 3.

[6] Id., ex. A-2 at 12 of 37.

[7] Id., ex. A ¶ 4; *but see* Document No. 19, ex. A ¶ 6 (stating that Plaintiff did not begin reporting to Dalcour until July 22, 2015).

[8] Document No. 28, ex. A ¶ 4.

2

excruciating pain in her neck and severe neuropathy in her left arm.[9] On April 20, Plaintiff contacted both Dr. Rossi and Plaintiff's direct supervisor, Margaret Drakeley, about her pain.[10] Drakeley requested a doctor's note, and on April 27, Plaintiff sent to Drakeley by email a note from Dr. Rossi instructing that Plaintiff could not lift or carry more than 5 pounds, together with an explanation by Plaintiff of her problems carrying the mail and a request to forward the note to "Environmental Health & Safety."[11] Drakeley forwarded the email to Julie Markee in that department, who responded to Drakeley the next day with three options: (1) Drakeley could work with Plaintiff and other managers to come up with a process to split up the mail so it would not need to be lifted in a single container; (2) Drakeley could work with the other managers to see if someone else could perform the duty without creating a hardship on the department; or (3) Plaintiff could request an ADA accommodation through the human resources ("HR") department.[12] There is no evidence in the record that these options were discussed with Plaintiff.

---

[9] Plaintiff testifies in her declaration that she first picked up the mail on April 17, id., but her April 27 email to her supervisor states that the first day had been April 10. Id., ex. A-5 at 34 of 37. The precise date is immaterial.

[10] Id., ex. A ¶ 5.

[11] Id., ex. A-5 at 34 of 37.

[12] Id., ex. A ¶ 5; id., ex. A-5 at 33 of 37.

3

Instead, Drakeley and another director met with Plaintiff on April 29 and told her that she could not return to work until Dr. Rossi answered their questions.[13] They took Plaintiff's badge and sent her home.[14] Dr. Rossi wrote a longer note on May 1, explaining:

> The above mentioned patient is currently under my neurological care. Mrs. Hawthorne has been diagnosed with cervical radiculopathy. She has a herniated disc in the cervical spine. Due to this condition, I recommend for her not to do any lifting as it may cause her symptoms to worsen. She will be re-evaluated on July 29, 2015, until then Mrs. Hawthorne cannot do any lifting. Should you have any questions please give my office a call.[15]

On May 4, Plaintiff received a telephone call from HR representative Alicia Jones, who told Plaintiff that she could not return to work because of Dr. Rossi's note.[16] Plaintiff asked if she needed to do anything, and Jones said that she could "pass [Plaintiff] on to Ester Mack," the HR family and medical leave representative.[17] Jones forwarded Plaintiff's information to Mack, which began the process for Plaintiff to take family and medical

---

[13] Id., ex. A ¶ 6.

[14] Id.

[15] Id., ex. A-6.

[16] Id., ex. A ¶ 7.

[17] Id.

4

leave.[18] The extent of Plaintiff's involvement in requesting such leave is unclear from the record.[19]

On May 12, Mack called Plaintiff to tell her that the family and medical leave paperwork completed by Dr. Rossi did not warrant continuous leave, and Plaintiff needed to obtain a release from Dr. Rossi to return to work.[20] Plaintiff responded that it was not Dr. Rossi but rather Defendant who had unilaterally taken Plaintiff off work.[21] A few days later, Dr. Rossi completed additional paperwork reporting that Plaintiff could not lift or carry more than 5 pounds and that her condition would periodically flare up requiring Plaintiff to be absent from work three times per month for one or two days at a time.[22] On May 15, Plaintiff received a letter from Mack stating that Plaintiff's department could not accommodate her lifting and carrying limitation and that Plaintiff's absence had been designated as protected family and medical leave.[23]

---

[18] Id.

[19] Defendant produces declaration testimony that Plaintiff on May 4 "requested and was granted FMLA leave." Document No. 19, ex. A ¶ 10. It is unclear if this is Defendant's characterization of Plaintiff's telephone call with Jones or if Plaintiff separately requested leave.

[20] Document No. 28, ex. A ¶ 8.

[21] Id.

[22] Id., ex. A ¶ 9.

[23] Id., ex. A ¶ 10.

On July 9, Plaintiff corresponded by text message with Drakeley to ask about coming back to work, and informed Drakeley that HR had told her she would have to be able to lift 25 pounds in order to return to work.[24] Plaintiff concluded that "there is no accommodation to be allowed which is against ADA law and qualifies as discrimination under EEOC laws."[25] Drakeley did not respond to Plaintiff other than to decline meeting with her, but wrote an email to Marnie Matheny, Defendant's Vice President of Contracting & Payor Relations, conveying the substance of her conversation with Plaintiff including Plaintiff's statement that Defendant was violating the ADA.[26] On July 14, Plaintiff filed a Charge of Discrimination with the EEOC, complaining that she had been discriminated against on the basis of her disability because Defendant "failed to engage in any interactive process in providing me with an accommodation, and it also failed to reassign me to another job as a form of accommodation."[27] Defendant did not receive a copy of the Charge of Discrimination until July 31, after

---

[24] Id., ex. B at 17 of 17.

[25] Id.

[26] Id.

[27] Id., ex. A ¶ 11; id., ex. C-1 at 6 of 7.

it had terminated Plaintiff's employment.[28] Plaintiff did not contact HR about the alleged discrimination.[29]

Meanwhile, on July 17, Plaintiff was released by Dr. Rossi to return to work with the restrictions that she could lift up to 25 pounds and carry 10 pounds, consistent with her job description.[30] Plaintiff returned to work on July 22.[31] A week later, on July 27, 2015, Defendant terminated Plaintiff's employment, citing "changing business needs."[32] Vice President Matheny, to whom Plaintiff did not directly report but who knew about Plaintiff's medical condition and text message complaint that Defendant failed to accommodate Plaintiff under the ADA, made the decision to terminate Plaintiff's employment.[33] She testifies in her declaration that she decided to eliminate one executive assistant position based on a departmental restructuring that began in February 2015 with the departure of a director, the elimination of a manager position, and the reassignment of various duties.[34] As a result of the restructuring, Defendant's need for executive

---

[28] Document No. 19, ex. A ¶ 13; id., ex. A-5.

[29] Id., ex. A ¶ 7.

[30] Document No. 28, ex. A ¶ 12; id., ex. A-7.

[31] Id., ex. A ¶ 12.

[32] Id., ex. A ¶ 13; id., ex. A-4.

[33] Document No. 19, ex. B ¶ 3; Document No. 28, ex. B at 103:5-12.

[34] Document No. 19, ex. B ¶¶ 2-5.

assistant support decreased, and Defendant decided to eliminate one of its three executive assistant positions.[35] A "rank and order analysis" was conducted on the three executive assistants and Plaintiff, as the executive assistant with the least seniority, was selected to be terminated.[36] The decision-making process, including a chart listing the tenure, hourly pay rate, and three years of performance scores of the three executive assistants, is documented in an undated one-page "Business justification for job elimination summary."[37] Plaintiff's performance scores were second highest among the three executive assistants, and all three had similar pay rates between $27.29 per hour and $28.28 per hour, although Plaintiff's was the lowest.[38] The executive assistant position Plaintiff had held was not reinstated or filled after her termination.[39]

After her termination, Plaintiff updated her EEOC Charge of Discrimination to allege that Defendant had discharged her in retaliation for her opposition to discrimination and her filing of

---

[35] Id., ex. A-6 ; id., ex. B ¶ 3.

[36] Id., ex. A-6 ; id., ex. B ¶¶ 4-5. Defendant determined that Plaintiff had a tenure of 3.82 years while the other executive assistants had been employed by Defendant for 6.66 years and 17.13 years. Id., ex. A-6.

[37] Id., ex. A-6.

[38] Id.

[39] Id., ex. A ¶ 12.

the EEOC Charge of Discrimination.[40] The EEOC issued a right to sue letter on April 28, 2017, and Plaintiff timely filed this suit, alleging discrimination and retaliation under the Americans with Disabilities Act ("ADA").[41] Defendant moves for summary judgment.[42]

## II. Legal Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence

---

[40] Document No. 28, ex. C-1 at 7 of 7.

[41] Document No. 1 (Orig. Compl.); Document No. 28, ex. C-1 at 3 of 7 (EEOC letter). In its summary judgment motion, Defendant argues that unless Plaintiff produces evidence that she filed suit within ninety days of receiving the EEOC's letter, the case must be dismissed for lack of jurisdiction. Document No. 19 at 25. In response, Plaintiff produces uncontroverted proof that she did not receive the EEOC's letter until May 3, 2017, such that her filing of this suit on August 1, 2017, was timely. Document No. 28, ex. C-1 at 2 of 7.

[42] Document No. 19.

9

of a 'genuine' issue concerning every essential component of its case." Id. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Id. 56(c)(3).

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course

would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

III. Discussion

A. Discrimination

Under the ADA, employers are prohibited from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Where a plaintiff relies on circumstantial evidence to support a claim of discrimination, the Court applies the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817 (1973). *See* E.E.O.C. v. LHC Grp., Inc., 773 F.3d 688, 694 (5th Cir. 2014). Under that framework, the plaintiff must first make out her *prima facie* case by showing: "(1) the plaintiff has a disability, or was regarded as disabled; (2) [s]he was qualified for the job; and (3) [s]he was subject to an adverse employment decision on account of [her] disability." Cannon v. Jacobs Field Servs. N. Am., Inc., 813 F.3d 586, 590 (5th Cir. 2016) (citing LHC Grp., 773 F.3d at 697). If the plaintiff is successful in establishing her *prima facie* case, a presumption of discrimination arises, and the defendant must respond with a legitimate, nondiscriminatory reason for the adverse employment

action. Id. (citing E.E.O.C. v. Chevron Phillips Chem. Co., LP, 570 F.3d 606, 615 (5th Cir. 2009)). Once the defendant meets its burden, the presumption dissipates, and the burden shifts back to the plaintiff to show pretext. Id.

A different framework applies where the plaintiff seeks to prove a failure to accommodate. The ADA defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). "A failure-to-accommodate claim provides a mechanism to combat workplace discrimination even when the employee in question *has not* suffered adverse employment action." LHC Grp., 773 F.3d at 703 n.6. "[A] plaintiff must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen., 730 F.3d 450, 452 (5th Cir. 2013).

Although Plaintiff's pleadings and briefing are not a model of clarity and at times conflate these standards, Plaintiff appears to

advance claims under both theories, namely, that Defendant discriminated against her on the basis of her disability or perceived disability by failing to make reasonable accommodations for her limitations while she was employed by Defendant and also by firing her based on its perception that she was disabled.

Turning first to Plaintiff's claim for failure to accommodate, Plaintiff has raised a fact issue as to each of the three required elements. Defendant argues for the first time in its reply brief that Plaintiff was not disabled or perceived as disabled,[43] but viewing the evidence in the light most favorable to Plaintiff, Plaintiff has raised a fact issue as to whether she is disabled and whether Defendant viewed her as such. *See* 42 U.S.C. § 12102(1) and (2) (defining "disability" for purposes of the ADA as including "a physical or mental impairment that substantially limits one or more major life activities of such individual" and "being regarded as having such an impairment," and defining "major life activities" to include "lifting" and "working"); *see also* id. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.").

---

[43] Defendant in its motion for summary judgment does state that Plaintiff "must establish she is a qualified individual with a disability," but makes no argument that she is not in fact disabled. Document No. 19 at 2, 22.

13

As for the second element, Plaintiff produces evidence that she spoke with her supervisor about her inability to lift the mail and submitted doctor's notes recommending that she limit her lifting, such that Defendant was aware of Plaintiff's impairment and indeed prohibited her from returning to work until she eventually obtained from Dr. Rossi a letter stating that she could lift 25 pounds.

Finally, Defendant argues that it accommodated Plaintiff's disability, but the only evidence on which it relies is a Human Resources Manager's conclusory statement in her declaration that "Hawthorne was accommodated for a lifting restriction imposed by her physician."[44] Defendant produces no evidence of any specific accommodation that Defendant provided to Plaintiff. Plaintiff, on the other hand, produces evidence showing that although Defendant had documented internal discussions about possible accommodations including having someone else pick up the mail, no such change was made to accommodate Plaintiff; instead, Plaintiff was prohibited from working until she was medically cleared to lift up to 25 pounds. Viewing this evidence in the light most favorable to Plaintiff, Plaintiff has raised a genuine issue of material fact as to whether Defendant failed to accommodate her disability, and Defendant is not entitled to summary judgment on Plaintiff's claim for failure to accommodate.

---

[44] Document No. 19, ex. A ¶ 10.

Turning to Plaintiff's termination-based claim, it is undisputed that Plaintiff was qualified for her job and that her termination was an adverse employment action. As noted above, Plaintiff has raised a fact issue as to whether she was disabled or perceived by Defendant as disabled. Viewing the summary judgment evidence in the light most favorable to Plaintiff--including Defendant's refusal to accommodate Plaintiff's lifting restriction and its termination of her employment a week after she returned from medical leave--a reasonable jury could conclude that at least one motivating reason Plaintiff was fired was because of her actual or perceived disability. *See* LHC Grp., 773 F.3d at 702 (under the ADA, discrimination need not be the sole reason for the adverse employment decision so long as it actually plays a role in the employer's decision making process and has a determinative influence on the outcome). Accordingly, Plaintiff has raised genuine issues of material fact as to all of the elements of a *prima facie* claim for discrimination.

Plaintiff concedes that Defendant has articulated a legitimate, non-discriminatory reason for her termination, namely, its elimination of an executive assistant position and its selection of Plaintiff as the least-senior executive assistant, but Plaintiff argues that this stated reason for her termination was pretextual.[45] Defendant does not argue or produce evidence that it

---

[45] Document No. 28 at 10-14.

15

was required by its policies to choose which executive assistant to fire on the basis of seniority rather than, for example, job performance reviews, which would have resulted in the firing not of Plaintiff but of a different employee.[46] Indeed, Vice President Matheny, who made the decision to terminate Plaintiff's employment based only on seniority, testified that she was unaware of any such policy.[47] Nor does Defendant cite to evidence of any other employee being terminated as part of the restructuring. When viewed in the light most favorable to Plaintiff, Matheny's knowledge of Plaintiff's lifting limitation and of her recent complaint that Defendant violated the ADA, together with Defendant's failure to accommodate Plaintiff's limitations and the timing of its decision to fire her one week after allowing her to return from a long medical leave, raise a genuine issue of material fact as to whether Defendant's proffered reason was pretext for discrimination.

---

[46] Defendant argues that this case "is governed by" Washington v. HCA Health Servs. of Texas Inc., 906 F. Supp. 386 (S.D. Tex. 1995), in which this Court granted summary judgment on an ADA disability discrimination claim where the plaintiff had been laid off in a reduction of force in which terminated employees were selected in reverse order of seniority. Document No. 19 at 18. That case is factually distinguishable because the employer's guidelines *required* the decision to be made based on seniority. *See* Washington, 906 F. Supp. at 392. More importantly, however, on appeal the Fifth Circuit reversed the district court, finding that even under those facts, the plaintiff had raised a fact issue as to whether his termination was pretextual and his disability was a motivating factor in his discharge. Washington v. HCA Health Servs., 95 F.3d 45 (5th Cir. 1996) (unpublished).

[47] Id., ex. B at 67:7-68:7.

Accordingly, Defendant is not entitled to summary judgment on Plaintiff's discrimination claim based on her termination.

B. <u>Retaliation</u>

Plaintiff alleges that "Defendant retaliated against Plaintiff, in violation of the ADA, by terminating Plaintiff after Plaintiff opposed Defendant's unlawful discriminatory conduct and employment practices."[48] Because the uncontroverted summary judgment evidence establishes that Defendant did not know of Plaintiff's filing of an EEOC Charge of Discrimination before it fired her, Plaintiff has dropped that argument as a basis for her retaliation claim. However, the summary judgment evidence does establish that fewer than three weeks before she was fired, Plaintiff had complained to her superior that denying her a reasonable accommodation was an ADA violation, and in turn this was reported by Drakeley to the decision-maker Vice President Matheny. Plaintiff's complaint of an ADA violation to her superiors in Defendant was a protected activity. Viewing the summary judgment evidence in the light most favorable to the non-movant, Defendant's motion for summary judgment on retaliation is denied.

---

[48] Document No. 1 at 8.

17

IV. Order

For the foregoing reasons, it is

ORDERED that Defendant KS Management Services, LLC's Motion for Summary Judgment (Document No. 19) is DENIED.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 13TH day of March, 2019.

*signature*
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE